In this case, the SCA makes internet information confidential and does not permit Google to disclose it to district attorneys on request. Issuance of process, such as a subpoena, search warrant, or SCA order, is required.[9] Therefore, in this case, ORS 135.815(1)(a) did not require the state to obtain, or the trial court to order the state to obtain, J's internet searches.
Defendant's next argument is that, even if ORS 138.815(1)(a) did not require that assistance, due process did. Due process undoubtedly requires the government to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. United States v. Agurs , 427 U.S. 97, 104 n. 10, 96 S.Ct. 2392, 49 L.Ed. 2d 342 (1976) ; Brady v. Maryland , 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963). However, defendant argues, citing Pennsylvania v. Ritchie , 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed. 2d 40 (1987), due process also requires a court to assist defendants in obtaining documents held by third parties in additional circumstances.
**237 In Ritchie , the defendant had been accused of child abuse and had subpoenaed information from a state protective service agency, Children and Youth Services (CYS). Id. at 43, 107 S.Ct. 989. CYS refused to comply with the defendant's subpoena, and the trial court refused to order it to do so. Id. at 43-44, 107 S.Ct. 989. The Supreme Court began by reciting the due process principle that "the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment," but it then considered whether the trial court was required to assist the defendant in obtaining records that were not in the prosecution's possession . Id. at 57-58, 107 S.Ct. 989 (emphases added). The Court answered that question affirmatively, concluding that the defendant's right to a fair trial entitled him to "know whether the CYS file contains information that may have changed the outcome of his trial[.]" Id. at 61, 107 S.Ct. 989. The Court recognized that, because the defendant had not yet reviewed the CYS records, it was not possible to say, with certainty, that they would contain material information and that requiring disclosure to make that determination arguably would intrude on the state's interest in confidentiality. Id. at 57, 107 S.Ct. 989. However, the Court also noted that a Pennsylvania statute permitted CYS to disclose otherwise confidential information when required to do so by court order, and determined that the trial court's in camera review would provide sufficient privacy protection. Id. at 58-61, 107 S.Ct. 989.
From Ritchie , defendant argues that due process requires a court to assist a defendant in obtaining potentially exculpatory evidence, including by requiring a prosecutor to employ legal process to obtain such material. The state responds that Ritchie may require a court to enforce a defendant's subpoena, but it does not require or permit a court to compel a prosecutor to issue process to obtain evidence that is held by a third party and that the prosecutor has no constitutional duty to produce.
We agree that, on its facts, Ritchie does not go as far as defendant suggests. In Ritchie , the Supreme Court ordered the trial court to assist the defendant by enforcing his own subpoena. But that does not mean that due process and the right to adduce evidence necessary to a fair trial **238 may not also require judicial or prosecutorial assistance in other circumstances. After all, courts must ensure that justice be done; a prosecutor is *260 the " 'servant of the law' " and always must be faithful to that mandate. Agurs , 427 U.S. at 110-11, 96 S.Ct. 2392 (quoting Berger v. United States , 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) ). For reasons articulated below, however, we need not step through that open door or precisely describe its measurements.
In this case, the trial court issued an order requiring the district attorney to take action permitted by the SCA to obtain J's internet searches, and the validity of that order is not before us. As noted, the state did not seek a writ of mandamus contesting the order, and the district attorney responded by issuing a subpoena that Google rebuffed. The question before us is whether, when defendant sought the court's assistance in compelling the district attorney to take further action, such as applying to the court for a search warrant or an SCA order, due process required the court to provide that particular assistance. It did not. Although the internet searches may have been sufficiently important and exculpatory to justify the trial court's initial order, there are two reasons that, together, persuade us that the need for the evidence was not so great that the court's failure to order the district attorney to issue process to Google deprived him of a fair trial. First, even if defendant could not prove the precise search terms that J used to search the internet without the searches themselves, he could prove that J had consulted the internet to determine whether what happened to her counted as rape. And second, issuance of process to Google was not the only means available to defendant to obtain evidence of the searches that J conducted. As more fully discussed below, J's computer may contain that evidence. Given those alternative means of informing the jury that J may have had doubts about whether she had been raped, we are not convinced that the Supreme Court would hold that the trial court's failure to order the district attorney to issue process to obtain that information from Google constituted a due process violation. The Court has been clear that, to prove a due process violation based on a deprivation of evidence, a defendant must demonstrate that the loss of evidence was so material and favorable that it prevented a fair **239 trial. United States v. Valenzuela-Bernal , 458 U.S. 858, 872, 102 S.Ct. 3440, 73 L.Ed. 2d 1193 (1982).[10] Accordingly, we conclude that the trial court did not err in retreating from its initial order and refusing to compel the state to apply for a search warrant or an SCA order.
B. Whether the trial court erred in denying defendant's motion to dismiss for prosecutorial misconduct
For the reasons that follow, we also conclude that the trial court did not err in denying defendant's motion to dismiss for prosecutorial misconduct. Defendant based his motion on a series of facts more fully described in the Court of Appeals' opinion in this case. Bray , 281 Or. App. at 592-94, 383 P.3d 883.[11] Those facts demonstrate that the state did not respond to the trial court's December 20 order by promptly issuing a subpoena to Google. It took the state months *261 to do so, and, when Google found the subpoena insufficient, it took the state weeks to so inform defendant and the court. By that time, trial was quickly drawing near, and the trial court was clearly perturbed by the state's delays. The trial court described the state's conduct as "foot-dragging and delay and resistance or reluctance * * * to comply." Yet, the court reasoned, the state eventually had done all that the trial court believed it could require, and defendant could establish that J conducted an internet search to determine whether what **240 had happened to her counted as rape. Consequently, the court concluded, the state's conduct did not justify dismissal.
The Court of Appeals used stronger terms to describe the state's conduct. It characterized the state's behavior as "seriously disturbing" and as "repeated, intentional and conceded defiance of a court order" that "is nothing short of an attack on the judicial system itself." Bray , 281 Or. App. at 594, 383 P.3d 883. Yet, like the trial court, the Court of Appeals also reached the conclusion that dismissal was not warranted. Id. The Court of Appeals reasoned that, because the trial court "ultimately ruled that it had no authority to issue the order that the state defied," that defiance had, in the final analysis, "no impact on the ultimate fairness of defendant's trial." Id. at 595, 383 P.3d 883.
We understand the trial court's ruling a bit differently-not as a determination that the court lacked authority to issue its December 20 order, but as a determination not to require the state to take further steps to comply with that order. We therefore assume that the trial court had authority to enter its December 20 order and consider whether, given the state's resistance to or defiance of that order, the trial court erred in denying defendant's motion to dismiss.
To answer that question, we must focus with particularity on the conduct at issue: the state's failure to promptly issue a subpoena to Google for J's internet searches. As explained above, this is not a case in which the state withheld material information that was in its possession or control, a due process violation that requires production of the information and a new trial. Rather, this is a case in which the state failed to take court-ordered action to obtain information that a third party-Google-may once have had but no longer retains.[12] Consequently, defendant contends that the state's conduct in this case is comparable to the state's conduct in cases in which the state deliberately destroyed or failed to preserve evidence that is irretrievably lost. In such circumstances, defendant contends, citing **241 California v. Trombetta , 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed. 2d 413 (1984), a court's only choice is to bar further prosecution or suppress the state's most probative evidence.
In Trombetta , the Court discussed " 'what might loosely be called the area of constitutionally guaranteed access to evidence,' " id. at 485, 104 S.Ct. 2528 (quoting Valenzuela-Bernal , 458 U.S. at 867, 102 S.Ct. 3440 ), and the "troubling choices" available to a court that must fashion remedies when potentially exculpatory evidence is permanently lost, id. at 486-87, 104 S.Ct. 2528. The Court's discussion referenced cases in which the state was responsible for irretrievable loss, whether by destroying evidence or by failing to take affirmative steps to preserve it. Id. Other cases that defendant cites also present similar facts. See Arizona v. Youngblood , 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed. 2d 281 (1988) (police responsible for failing to refrigerate semen samples from victim's body and clothing); Miller v. Vasquez , 868 F.2d 1116, 1119 (9th Cir. 1989) (investigating officer responsible for failing to collect the victim's bloodstained jacket and photograph the defendant's scratched arms); State v. Faunce , 251 Or. App. 58, 63, 282 P.3d 960 (2012) (police responsible for returning pistol to a suspect). This case is different. At this point, defendant has not demonstrated either that J's digital data is irretrievably lost or that the state's delay in subpoenaing that data caused its loss.
As we explain below, there still is a possibility that defendant will be able to obtain J's *262 internet searches from her computer. Below, we conclude that the trial court erred in refusing to enforce defendant's subpoena of that computer and remand to that court to determine whether to grant a new trial. It is possible that J's computer will contain evidence of J's internet searches and that defendant will be able to obtain and use that evidence.
In addition, even if J's internet searches are irretrievably lost, defendant has not demonstrated that the state's delay in issuing its subpoena caused that loss. In response to the state's subpoena, Google refused to disclose J's internet searches, taking the position that only a search warrant would suffice. Defendant did not establish that, had the state acted more promptly, Google would have produced the requested searches. Thus, defendant has not established that the state's conduct, no matter how egregious, resulted **242 in irretrievable loss. Defendant does not cite legal authority demonstrating that a due process violation occurs or that dismissal with prejudice is warranted in that circumstance.[13]
We therefore conclude that the trial court did not err in denying defendant's motion to dismiss for prosecutorial misconduct and turn to the state's petition for review and the issue on which the potential for a new trial pivots-whether the trial court erred in denying defendant's motion to compel J to produce her computer at trial.
II. THE STATE'S ISSUE ON REVIEW
Defendant served J with a subpoena requiring her to "appear before the Circuit Court" on the date and at the time of the trial "to give evidence in the above-entitled matter on behalf of the defendant," and to bring with her to court:
"1. The computer or its cloned hard drive copy that [J] used on February 26, 2011 to perform an internet search;
"2. Any and all writings, journal entries, or diary entries that [J] created regarding [defendant] or the allegations associated with this case from 2/22/11 until the present date; and,
"3. Any external storage devices containing data from items 1 & 2."
J did not comply. She appeared and testified, but told the court that she had not brought her computer with her.[14]
**243 J testified that any data that defendant sought to examine no longer existed; she had "flattened" the hard drive of the computer-i.e. , used the installation disk to wipe it free of all saved data-in March 2011, within weeks after the rape. J said that she had done so because she was afraid that the media, which had reported intrusive information about her, would hack her computer. J testified that she had given copies of the only relevant journal entries that still existed to the prosecutor and that they had been offered into evidence.
At the conclusion of J's testimony, the court considered defendant's motion to compel J to bring her computer to court. Defendant told the court that even a "flattened" computer could disclose the contents of J's Google search and any journal entries that she had created. Defendant added that the computer might contain data that could contradict J's testimony about the timing of her efforts to "flatten" the hard drive and disclose whether J had made those efforts after he had attempted to obtain her internet records from Google. Defendant offered the services of a forensic examiner who could decipher *263 the computer's digital information and provide relevant data to the court for in camera inspection. In opposition, the state argued that enforcing the subpoena would violate J's constitutional right to privacy; it also suggested that defendant had not sufficiently demonstrated that the computer would provide admissible impeaching evidence.
The trial court was not troubled by defendant's failure to more particularly describe the evidence that he sought or to demonstrate its admissibility more conclusively. When the state told the trial court that, "[i]n order for a prior inconsistent statement to be admissible at trial, it must be inconsistent, and [not] just speculation as to whether it's inconsistent," the court interrupted. The court told counsel that that argument was directly contrary to this court's decision in State v. Cartwright , 336 Or. 408, 420, 85 P.3d 305 (2004), requiring production of statements that potentially could be used in cross-examination. The trial court was troubled, however, by the privacy concerns that the state raised. The court was concerned that a forensic examiner would have access to private information and denied defendant's motion to compel.
**244 In the Court of Appeals, the state echoed the trial court's privacy concerns. In its brief before that court, the state argued that, "even if it [is] assumed arguendo that defendant made an adequate showing that the victim's computer might have exculpatory information in it," the trial court was in no position to separate relevant information from irrelevant, confidential information. Turning the computer over to a defense expert, the state asserted, would "violate the witness's legitimate expectation of privacy."
The Court of Appeals began its analysis with a review of the controlling Oregon statutes. Bray , 281 Or. App. at 609, 383 P.3d 883. ORS 136.567(1) provides that "[a] defendant in a criminal action is entitled * * * to have subpoenas issued," and ORS 136.575 provides a template for a subpoena directed to an individual. ORS 136.580 adds that,
"(1) If books, papers or documents are required, a direction to the following effect shall be added to the form provided in ORS 136.575 : 'And you are required, also, to bring with you the following: (describing intelligibly the books, papers or documents required).'
"(2) Upon the motion of the state or the defendant, the court may direct that the books, papers or documents described in the subpoena be produced before the court prior to the trial or prior to the time when the books, papers or documents are to be offered in evidence and may, upon production, permit the books, papers or documents to be inspected and copied by the state or the defendant and the state's or the defendant's attorneys."
The Court of Appeals relied on Cartwright for the proposition that ORS 136.580 permits a party to subpoena audiotapes to obtain their contents and determined that that statute also permits a party to subpoena a computer to obtain its digital contents. Bray , 281 Or. App. at 610-11, 383 P.3d 883. The court then went on to consider and reject the state's argument that J has "a constitutional right to withhold material that might contain relevant, exculpatory, unprivileged evidence on the ground that [ ] she has a privacy interest in that material." Id. at 612, 383 P.3d 883. The court declared that "[n]othing in Oregon law supports the state's position," id. , and it reached the same **245 conclusion with respect to federal law: "The United States Supreme Court has likewise held that '[i]t is the manifest duty of the courts to vindicate [the Sixth Amendment Confrontation Clause], and to accomplish that it is essential that all relevant and admissible evidence be produced,' including 'documents,' even where the possessor lodges a privacy-based claim of exemption." Id. at 612-13, 383 P.3d 883 (quoting United States v. Nixon , 418 U.S. 683, 711, 94 S.Ct. 3090, 41 L.Ed. 2d 1039 (1974) ). Thus, the court said, " '[T]he use of a properly limited subpoena does not constitute an unreasonable search and seizure under the fourth amendment.' " Id. at 613-14, 383 P.3d 883 (quoting United States v. Palmer , 536 F.2d 1278, 1282 (9th Cir. 1976) ).
On review in this court, the state assumes that the digital data that defendant seeks is equivalent to other documentary material that can be obtained by a subpoena *264 duces tecum under ORS 136.580. It also assumes that a "properly limited" subpoena duces tecum does not result in an unconstitutional search or seizure or wrongfully intrude on a witness's right to privacy as protected by the state or federal constitutions.[15] Nevertheless, the state claims that the result that the Court of Appeals reached was incorrect. Defendant, the state asserts, used his subpoena not to obtain admissible evidence, but as a discovery tool. Therefore, the state contends, defendant's subpoena was not "properly limited." According to the state, and like the corollary federal rule interpreted in Nixon , 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039, Federal Rule of Criminal Procedure 17(c) ( FRCrP 17(c) ), ORS 136.580 required defendant to jump, and defendant failed to clear, three hurdles applicable here: (1) specificity, (2) relevancy, and (3) admissibility.[16] **246 Defendant's first response is that the state also has a bar to clear. Defendant contends that the state did not argue, in the trial court or in the Court of Appeals, that Nixon , or the rule there articulated, applied in state court, and, therefore, failed to preserve that argument for consideration here.
We agree with defendant that the state's argument has evolved. In the trial court and the Court of Appeals, the state focused its objection to enforcement of defendant's subpoena on the invasion of privacy that it contended would occur if forensic examination were permitted. In this court, the state focuses, instead, on the invasion of privacy that it contends will occur because defendant has not established a sufficient justification for that examination; defendant has not made a sufficient showing under ORS 136.580, as properly interpreted, that the information he seeks will be admissible at trial.
Evolution of argument from the pressures of trial to reflection on review is not uncommon. Over time, parties carefully scrutinize their positions, and we benefit when they forthrightly put aside the weaker in favor of the stronger. Read too restrictively to preclude us from considering parties' later, more refined arguments, our preservation rule could preclude us from considering the parties' best arguments or answering pressing questions as completely as we might like. On the other hand, our role is to decide disputes that were presented below, and our preservation rule serves important principles-procedural fairness to the parties and the trial court, judicial economy, and full development of the record. See Peeples v. Lampert , 345 Or. 209, 219-21, 191 P.3d 637 (2008) (discussing and reaffirming the importance of the preservation rule). "Ultimately, the preservation rule is a practical one, and close calls-like this one-inevitably will turn on whether, given the particular record of a case, the court concludes that the policies underlying the rule have been sufficiently served." State v. Parkins , 346 Or. 333, 341, 211 P.3d 262 (2009).
Here, we conclude that the state raised, at least in a general sense, in both the trial court and the Court of Appeals, the issue of what is necessary for a subpoena **247 duces tecum to be both statutorily and constitutionally valid. Although the state assumed, for purposes of argument in the Court of Appeals, that defendant had made a sufficient showing of materiality and admissibility to justify its production, that did not stop that court from discussing the statutory and constitutional contours that a subpoena duces tecum must meet and evaluating whether they had in fact been met. Those standards are fairly in play. Although the question in this case is a close one, we conclude that the policies underlying the preservation rule have been sufficiently served. We therefore turn to the merits of the state's argument- *265 viz. , that, under ORS 136.580, a party seeking enforcement of a subpoena duces tecum must describe with particularity the evidence that it seeks and demonstrate that that evidence will be relevant and admissible. In this case, the state contends, defendant did not make the necessary showing with respect to any of the categories of evidence that he claimed would be disclosed on inspection of J's computer.
As to J's internet searches, the state argues that defendant did not demonstrate that those searches necessarily would disclose evidence that would impeach J's trial testimony and therefore be relevant and admissible. As to journal entries about "defendant or the rape," the state argues that defendant's request was too broad and that defendant did not show that the computer ever had contained any relevant and admissible entries: Any such entries would be inadmissible hearsay in defendant's case-in-chief, and their impeachment value was purely speculative. As to evidence about when J "wiped" her computer, the state argues that defendant did not demonstrate that the computer would contain such information or conflict with J's testimony. As a result, the state contends, defendant did not meet the statutory requirements of specificity, relevance and admissibility.
For the reasons that follow, we conclude that ORS 136.580 does not require that a party serving a subpoena duces tecum describe the evidence that it seeks and demonstrate its admissibility with that degree of certainty. Rather, as we will explain, when a party subpoenas a witness to produce material for cross-examination at trial, ORS 136.580 **248 requires a court to order the production of the material unless it is clear that the material has "no potential use" for that purpose.
As noted, ORS 136.580 permits parties to subpoena witnesses to produce documents and other materials at trial, and this court interpreted that statute in Cartwright , 336 Or. 408, 85 P.3d 305. In Cartwright , the defendant was accused of criminal harassment and other crimes based on complaints by employees at his place of work. Id. at 410, 85 P.3d 305. The defendant's employer had investigated those complaints, and the defendant issued two subpoenas requiring the employer's general manager to appear pretrial and bring along audiotaped interviews with the complainants. Id. at 410-11, 85 P.3d 305. The defendant also issued a third subpoena requiring production of the audiotapes at trial. Id. at 411, 85 P.3d 305. The employer moved to quash all three subpoenas, and the defendant moved to compel compliance. Id. at 410-12, 85 P.3d 305. The employer argued that compliance was not required because defendant was attempting to obtain discovery that Oregon law did not permit and that the tapes were protected "work product." Id. at 411, 85 P.3d 305. The trial court agreed with the employer, as did the Court of Appeals. State v. Cartwright , 173 Or. App. 59, 77, 20 P.3d 223 (2001).
The Court of Appeals began with a discussion of the pretrial subpoenas that the defendant had issued, id. at 62-65, 20 P.3d 223, and explained that ORS 136.580 is "essentially identical to the corollary federal subpoena provision of Rule 17(c) of the Federal Rules of Criminal Procedure," id. at 67, 20 P.3d 223. Both rules, the court explained, provide "a means for production of evidence, not informational discovery." Id. at 67-69, 20 P.3d 223. In Nixon , the court explained, the United States Supreme Court had construed FRCrP 17(c) and adopted a four-factor test to ensure that the pretrial use of a subpoena duces tecum "does not transform subpoenas into general discovery devices." Id. at 68, 20 P.3d 223. The Oregon Court of Appeals deemed that test applicable to a subpoena issued pursuant to ORS 136.580(2) and applied it to determine whether the defendant had made the showing required in Nixon . Id. at 69-72, 20 P.3d 223.
In Nixon , the trial court ordered pretrial production of taped conversations between the President and his advisors, 418 U.S. at 686, 94 S.Ct. 3090, and the Supreme Court concluded **249 that the trial court had not erred in exercising its discretion to do so, id. at 713, 94 S.Ct. 3090. However, in Cartwright , the trial court granted the employer's motion to quash the defendant's pretrial subpoenas, and the Court of Appeals affirmed, finding that the defendant had failed to make a sufficient showing that the audiotapes were *266 "evidentiary." 173 Or. App. at 69-70, 20 P.3d 223. The court explained that "whether the tape recordings would 'ripen' into evidentiary material depended not only on whether the victim-witnesses actually testified, but also on the precise substance of their testimony." Id. at 70, 20 P.3d 223. Thus, the Court of Appeals concluded, pretrial production of the audiotapes was premature, and the trial court had not erred in quashing the defendant's pretrial subpoenas. Id. at 72, 20 P.3d 223.
The Court of Appeals reached the same conclusion as to the defendant's trial subpoena. Id. at 77, 20 P.3d 223. The court described defendant as taking the position that the constitution entitled him "to require a nonparty to produce materials of unknown materiality and favorability, despite the nonparty's claim of privilege, merely because, by taking the witness stand, the witness's credibility is necessarily placed at issue." Id. The court remarked that "[n]o case supports his position." Id.
This court allowed review and construed ORS 136.580(2) differently. Instead of comparing that statute to FRCrP 17(c) and adopting the Nixon rule to distinguish between subpoenas that are incorrectly used as discovery devices and those that seek the production of evidence, the court concluded that ORS 136.580 draws that distinction based on when the subpoena orders production to occur. Cartwright , 336 Or. at 415-17, 85 P.3d 305. The court explained that no Oregon law permits a defendant to command production of materials on a date prior to trial when no evidence is to be taken. Id. Thus, the first two subpoenas that the defendant in Cartwright had issued sought unobtainable discovery and could not be enforced. Id. at 416-17, 85 P.3d 305. In contrast, however, an "ordinary subpoena"-i.e. , one that demands that a witness bring materials to a defendant's trial or an evidentiary trial-related proceeding-"is not and cannot amount to an attempt to obtain discovery." Id. at 417-18, 85 P.3d 305. In reaching that conclusion, the court recognized that ORS 136.580(2)
**250 provides a specific mechanism for a party to seek access to subpoenaed material before trial. Id. at 415, 85 P.3d 305. However, the court explained, that mechanism is not a mechanism by which a party can command early production; it only permits a party to ask the court for that benefit and grants a trial court discretion to allow it. Id. An "ordinary subpoena," the court further explained, is not a discovery device because it "does not require production of the material to the party issuing the subpoena; it merely commands that the witness bring the material to the courtroom so that it is available if and when a party needs it." Id. at 418, 85 P.3d 305. Such a subpoena must be enforced, the court said, "unless it is clear that the material or testimony has no potential use at trial ." Id. at 419, 85 P.3d 305 (emphasis added).[17]
Applying that test to the third subpoena that the defendant had issued, the court concluded that the trial court erred in denying the defendant's motion to compel. Id. The court reasoned that, "even if the trial court had some choice as to whether to make the audiotapes available to [the] defendant on the morning of trial, as the third motion to compel apparently requested, it had no choice in the matter after those witnesses testified." Id. at 420, 85 P.3d 305 (emphasis in original; footnote omitted). "[W]hen a litigant requests that a witness's prior statement be made available for use in his or her cross-examination, the court must honor that request." Id.
Thus, under Cartwright , ORS 136.580 provides two clear rules. First, a party is not entitled to use a subpoena duces tecum to compel production on a date prior to trial when no evidence will be taken, although a party may request and a trial court may allow pretrial production. Second, a party *267 is entitled to use an ordinary subpoena duces tecum to compel production at trial. After a witness testifies, the court must require production of the subpoenaed material. **251 The court then must make that material available to the party subpoenaing it for use in cross-examination, unless it is clear that the material or testimony has "no potential use" for that purpose. In that circumstance, there is no reason to require a court to predict, with certainty, in advance of that witness's testimony, whether the subpoenaed material will in fact be relevant and admissible. When a party uses a subpoena duces tecum to compel production of materials for cross-examination at trial, the court has control over those materials and will have an opportunity to make the more exacting determinations necessary to their admissibility.
Requiring a more specific demonstration of the admissibility of evidence before a party obtains it would not only be impractical, it also would fail to give due consideration to the role that the full disclosure of facts plays in our system of justice and the constitutional underpinnings of the subpoena statute. As the court explained in Nixon , "[t]he very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence." 418 U.S. at 709, 94 S.Ct. 3090. Moreover, "[t]he right to the production of all evidence at a criminal trial * * * has constitutional dimensions." Id. at 711, 94 S.Ct. 3090. Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution confer the right of confrontation and compulsory process, and the Fifth Amendment to the United States Constitution ensures due process. Courts must vindicate those guarantees, and "to accomplish that it is essential that all relevant and admissible evidence be produced." Nixon , 418 U.S. at 711, 94 S.Ct. 3090 (discussing federal constitutional underpinnings of FRCrP 17(c) ).
In this case, then, ORS 136.580 provided a statutory basis for defendant's subpoena of J's computer and the digital evidence it contains.[18] Under Cartwright , the trial court was required to enforce defendant's trial subpoena as long as defendant demonstrated that J's computer and its contents had some potential use in J's cross-examination at trial.
**252 Here, the trial court expressed no concern with defendant's ability to meet that requirement. Instead, the trial court expressed concerns about the broad forensic examination that would be required to access the potentially relevant data in J's computer and the effect that would have on J's right to privacy. Cartwright did not iron out those wrinkles. In Cartwright , the subpoenaed materials were the prior tape-recorded statements of witnesses. 336 Or. at 410, 85 P.3d 305. The court could ascertain the nature of those statements without forensic assistance and, from their nature, could determine that any objection under the work product doctrine that might be asserted would be waived when the witnesses testified; the court was not required to consider problems that could arise if the subpoenaed material included both relevant and irrelevant information. In Cartwright , the employer did not argue that production of the audiotapes would necessitate forensic examination or a broad review of additional potentially irrelevant, confidential, or privileged information and thereby raise constitutional privacy concerns.
But here, as the trial court recognized, neither the parties nor the court could know, without a forensic examination of J's computer, precisely what data it contained, and there was no doubt that it contained chaff as well as wheat. An individual "generally has a privacy interest in the information on his or her personal computer." State v. Mansor , 363 Or. 185, 208, 421 P.3d 323, 337 (2018).
In Mansor , we recognized the unique characteristics of a search for data contained in such computers. Id. at 208-09, 421 P.3d 337-38. We recognized that a broad search of a personal computer may present risks to individual privacy similar to those presented by general warrants, and we adopted rules specific to such searches to ensure that an individual's *268 right to computer privacy is adequately protected. Id. at 216-21, 421 P.3d 323.
A subpoena that requires the production of a computer at trial and necessitates a forensic examination of its digital contents presents similar risks to individual privacy, and we have a similar obligation to adopt rules to protect against those risks. In Mansor , one of the rules that we adopted requires the party seeking to examine a computer **253 to describe with particularity "what" the party seeks to find and the temporal limitations if relevant and available. Id. at 216-18, 421 P.3d 323. We also imposed limits on the use of information disclosed in the examination; a search is limited to the information identified in the warrant unless some warrant-exception applies. Id. at 221, 421 P.3d 323. Similar rules are appropriate in this context. When a party is entitled to enforcement of a trial subpoena duces tecum for a witness's computer and its digital contents, the court must ensure that the forensic examination is reasonable and that only the digital information that was identified as potentially relevant to the cross-examination of that witness is disclosed to the parties and admitted.
If a witness's only objection to a forensic examination is a generalized privacy objection and not a particularized objection based on a recognized privilege or statutory grant of confidentiality, then those rules, as articulated in Mansor , should be sufficient to protect against an invasion of the witness's privacy. See Nixon, 418 U.S. at 713, 94 S.Ct. 3090 (President's generalized interest in confidentiality "must yield to the demonstrated, specific need for evidence in a pending criminal trial."). If, however, the witness contends that the computer contains privileged information or information statutorily protected from disclosure, further protections, such as in camera inspection to ensure that privileged or statutorily protected information is not released, may be warranted. See, e.g., United States v. Zolin , 491 U.S. 554, 556-57, 109 S.Ct. 2619, 105 L.Ed. 2d 469 (1989) (in camera inspection may be required to determine the applicability of the crime-fraud exception to the attorney client privilege); Nixon , 418 U.S. at 714-16, 94 S.Ct. 3090 (in camera inspection examination necessary to assess President's objection based on executive privilege); Frease v. Glazer , 330 Or. 364, 372, 4 P.3d 56 (2000) (adopting Zolin framework to determine whether trial court may order in camera review to determine applicability of Oregon's crime-fraud exception); Warren , 304 Or. at 434-35, 746 P.2d 711 (requiring in camera inspection to protect against the release of information statutorily protected from disclosure).
In this case, defendant made the requisite threshold showing for the enforcement of his trial subpoena because **254 he demonstrated that J's computer contained digital data that had potential use in her cross-examination. J told the police that, after her encounter with defendant, she used her computer to conduct an internet search to determine if what had happened counted as rape. J also testified that she had made journal entries on her computer about defendant or the rape and that she had "flattened" her computer to delete all digital information. The trial court did not and could not find that that evidence had "no potential use" at trial. Therefore, the trial court was required to enforce defendant's trial subpoena and to compel J to bring her computer with her to trial.
In the ordinary case, when a party seeks to enforce a trial subpoena for a computer, the party will want to obtain the digital information in the computer and not the computer itself. In that instance, the party also will want to obtain a forensic examination of the computer and a report of the examination. Whenever a court is asked to order such an examination and report, the court must impose conditions necessary to protect against the unreasonable invasion of a witness's privacy, including prescribing the contours of the examination and the terms of requested protective orders. In addition, if a party seeks information protected against disclosure by privilege or statute, the court must consider whether to conduct an in camera inspection to ensure against their dissemination.
*269 [19] Finally, when a trial is underway at the time of a party's request for forensic examination, a court is entitled to consider the delay, if any, that would result from such an examination. We note that, under ORS 136.580(2), a party may request that such an examination take place pretrial. Although such a request was not at issue here, and we therefore do not consider the applicable standards for pretrial court evaluation, we think it important to call attention to this available option.
In this case, however, the trial court did not have the opportunity to take those steps because it determined, at the outset, that it would not enforce defendant's subpoena.
**255 That was an error, and we must determine what corrective action, if any, is necessary. We faced similar circumstances in Cartwright , and that case again provides guidance.
In Cartwright , as noted, we held that the trial court had erred in failing to require the production of audio recordings that, the defendant contended, could contain impeaching witness statements. 336 Or. at 419-20, 85 P.3d 305. We also held that the trial court's error was not harmless because the defendant did not have the benefit of those recordings and "cross-examining those witnesses on their prior statements could have been a very effective method of undermining the state's case." Id. at 420, 85 P.3d 305. As a result, we vacated the defendant's convictions but remanded for the court to require production of the recordings and then decide whether to order a retrial or reinstate the convictions. Id. at 421, 85 P.3d 305. On remand, we explained, the defendant would have an opportunity to review the recordings and, if the defendant found that there was material that could serve as a basis for impeaching or otherwise discrediting the witness, seek a hearing. Id. After a hearing, the trial court could order a new trial, or, alternatively, make findings that the "defendant's inability to use the materials could not have affected the verdict" and reinstate the original judgment of conviction. Id .
A similar remedy is appropriate under these circumstances. Here, the trial court erred in failing to require J to produce her computer for forensic examination, and J's computer could have contained evidence that could have provided for an effective cross-examination of J, who was the key witness in the state's case. Therefore, the trial court's error was not harmless, and we vacate defendant's convictions and remand to the trial court to order J to produce her computer and subject it to forensic examination.[20] In doing so, the court must impose conditions on that examination that are necessary to protect J's privacy interest in the digital contents of the computer. The court must, for example, prescribe the contours of the examination and the terms of any requested protective orders. On completion of the forensic **256 examination, the trial court must permit defendant to review its results and seek a hearing. At a hearing, defendant must inform the court of the evidence that he would have offered at trial and explain its purpose. The court then must decide whether to order a new trial, or, alternatively, make findings that "defendant's inability to use the [subpoenaed] materials could not have affected the verdict," Cartwright , 336 Or. at 421, 85 P.3d 305, and reinstate defendant's convictions.
The decision of the Court of Appeals is affirmed. The judgment of the circuit court is vacated, and the case is remanded to the circuit court for further proceedings.

As noted, an SCA order may be issued only if "the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the * * * information sought[ ] [is] relevant and material to an ongoing criminal investigation." 18 USC § 2703(d). Defendant does not argue that the court was authorized to issue an SCA order on application by defendant.

We also are not convinced that the Supreme Court would find a violation of due process under its decision in Wardius v. Oregon , 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed. 2d 82 (1973). In Wardius , the Court held that the Due Process Clause forbade enforcement of an alibi rule that required the defendant to inform the state before trial of his intention to call an alibi witness but that did not permit the defendant reciprocal discovery. Id. at 472, 93 S.Ct. 2208. In reaching that conclusion, the Court stated that "discovery must be a two-way street." Id. at 475, 93 S.Ct. 2208. Relying on Wardius , defendant argues that, because, under the SCA, the state can obtain information that he cannot, the trial court was required to correct a similar imbalance here and to do so by requiring the state to assist him. Wardius is a narrow decision that does not extend to the different facts presented here. Unlike the rule at issue in Wardius , the SCA "does not deal with mandatory disclosure imposed on a defendant but not on the prosecution." State v. Bray , 281 Or. App. 584, 604, 383 P.3d 883 (2016). Like the Court of Appeals, and for the reasons it outlined, we also "find no authority to expand Wardius as defendant urges[.]" Id. at 606, 383 P.3d 883.

Defendant contends that the state's conduct was even more egregious than described by the Court of Appeals, and the state contends that it made reasonable efforts to comply with the trial court's order that the Court of Appeals misunderstood. Our decision on this issue does not depend on whether either party's characterization of the facts is correct, and we do not think it would benefit the bench or bar to make that determination or to set out those facts in detail here.

No party argues that it would now be possible for the court to issue a search warrant or an SCA order to obtain the Google records.

Like the Court of Appeals, we express no opinion about whether the prosecutors violated disciplinary rules or acted in contempt of court. See Bray , 281 Or. App. at 594 n. 8, 383 P.3d 883 (so stating). We also decline to decide, at this stage of the proceedings, whether, on remand, the trial court could order remedies for the state's delay.

J filed a civil suit against defendant in November 2011. That case was stayed pending the resolution of this criminal case. The trial judge in the civil case ordered the creation of multiple clones of J's hard drive. In this criminal case, the trial judge denied defendant's motion to require J to produce her computer at trial but granted defendant's request to have one of the clones placed in the trial court file. In an interlocutory appeal of that order, this court affirmed the trial court's order preserving the clone and left open the issue of whether defendant was entitled to gain access to it. State/J.B. v. Bray , 352 Or. 809, 820, 291 P.3d 727 (2012). This court noted that the "order protects [J's] rights while preserving defendant's opportunity to challenge that ruling before the appellate courts." Id.

Amici , including J, make two different privacy arguments. First, they contend that, because J has a privacy interest in her computer and its contents, no search or seizure was permitted without a search warrant. The state does not make that argument here, and we decline to address it. Second, amici contend that requiring J to produce her computer would violate her rights under Article I, section 42(1)(c), of the Oregon Constitution. The state did not make that argument at trial or in the Court of Appeals. In fact, at trial, when the court specifically inquired whether the state was relying on Article I, section 42(1)(c), the state responded that it was not. We also decline to address amici 's second argument.

The state does not contend that the federal constitution requires application of the Nixon rule.

Although the state sees Cartwright as applicable only in circumstances in which a testifying witness has made a comprehensive recorded statement about offenses, we do not agree. In Cartwright , we clearly said that a court considering a motion to quash a subpoena duces tecum "must look at the potential uses of the subpoenaed material" and "unless it is clear that the material or testimony has no potential use at trial, the court must deny the motion to quash." State v. Cartwright , 336 Or. 408, 419, 85 P.3d 305 (2004) (first emphasis in original; second emphasis added).

Because ORS 136.580 granted defendant a right to subpoena J's computer, we do not reach his argument that the state or federal constitutions also grant that right.

A trial court's authority to require an in camera inspection is not necessarily limited to this circumstance, but an in camera inspection generally will be required in this instance.

Ordinarily, a court also would consider whether to order forensic examination and would consider questions of judicial administration, including potential delay. Such questions may not pertain on remand here because forensic examination will occur before a retrial, if there is one.