706 December 11, 2024 No. 889

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

TREVOR ALAN GILMORE,
*Defendant-Appellant.*

Josephine County Circuit Court
18CR78162; A174480

Matthew G. Galli, Judge.

Argued December 11, 2023.

Erik Blumenthal, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Robert M. Wilsey, Assistant Attorney General, argued the cause for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, Pagán, Judge, and Mooney, Senior Judge.

PAGÁN, J.

Affirmed.

**PAGÁN, J.**

Defendant appeals from a conviction for first-degree manslaughter raising three assignments of error and three additional supplemental assignments of error. In his first assignment, defendant argues that the trial court erred by denying his motion to reconsider the verdict. He argues that because the court found that he had been justified in using deadly force against one victim, it was legally impermissible for the court to also find that defendant had acted recklessly toward another victim in the same incident.

In his second and third assignments, defendant argues that the trial court erred by denying his motion to compel the prosecutor to obtain and disclose records of a child witness's therapy records, counseling records, and records relating to a forensic interview of the child at a Child Advocacy Center (CAC) in the state of Missouri. Further, in three supplemental assignments, defendant argues that the trial court violated his due process rights by convicting him of a lesser-included crime without sufficient notice; that he was entitled to a judgment of acquittal under ORS 161.209 and ORS 161.219; and that the trial court erred by convicting him of first-degree manslaughter. For the reasons explained below, we affirm.

## I.   FACTS

On Thanksgiving, November 22, 2018, defendant was staying at the apartment of his wife, Brandi, in Grants Pass, Oregon. The couple had two children, K and T. T was 17 years old at the time and was dating A, the daughter of S. T typically stayed with S and S's wife, MeLisa, who lived nearby. S and MeLisa also had a young son and a daughter, G, who was eight years old. During that evening, A was babysitting the younger children with T when S and MeLisa returned from a bar with S's friend, L. S and MeLisa were in a heated argument, so T and A brought the children to Brandi's apartment. At some point, MeLisa also came to the apartment.

Shortly before 3:00 a.m., S and L arrived at Brandi's apartment, looking for MeLisa. S banged on the door and defendant let him in. S began yelling at MeLisa to leave.

Defendant told S that he could not yell like that and told them to leave. S told defendant that he should stay out of it if he did not want to be "fucked up." At some point, T told defendant that he might want to go to his room because S was going to beat him up. Defendant went back to his bedroom and emerged with his semi-automatic handgun. Defendant went back down the hall, positioned behind the couch, and continued telling S and L that they needed to leave.

S went around the hallway couch toward defendant, saying something to the effect of "what are you going to do about it?" L was positioned behind S and was telling defendant to "be chill" and to "calm down." Defendant then fired multiple shots in a rapid sequence, striking both S and L. The two men staggered out of the apartment. S made it to the lawn outside where he collapsed and died. L collapsed and died just outside the front door.

The state charged defendant by indictment with two counts of aggravated murder with a firearm, ORS 163.095 (Counts 1 and 3) and three counts of unlawful use of a weapon with a firearm, ORS 166.220 (Counts 2, 4, and 5). During the bench trial, defendant raised a self-defense justification, contending that his use of deadly force was reasonable in the face of S and L committing felony crimes of coercion and burglary.

The court found defendant guilty on Count 3 of first-degree manslaughter with a firearm, ORS 163.118(1)(a),[1] for recklessly causing L's death. Finding that defendant's use of deadly force against S was justified, the court acquitted defendant of the remaining charges. The court stated that defendant had recklessly caused L's death under circumstances manifesting extreme indifference to the value of human life because defendant fired his gun at S and L while those men were present in a crowded living room. Specifically, the court stated:

---

[1] ORS 163.118(1)(a) provides:

"Criminal homicide constitutes manslaughter in the first degree when:

"(a) It is committed recklessly under circumstances manifesting extreme indifference to the value of human life[.]"

"I do believe, based upon the testimony of the individuals in the room, that * * * the state did meet its burden of proof in proving that it was not reasonable for a person to use deadly force against [L].

"* * * * *

"I find that [L] was shot in the course of [defendant] defending himself against [S]. I struggled with whether this was intentional. Whether I could find some intent in these—in this—in the ballistics, in anything. I can't.

"But firing a weapon in close quarters at another person when you do not have essentially a safe backstop is reckless. It is a risk * * * [of] such the nature and degree that disregarding that risk would constitute a gross deviation from the standard of care that someone should exercise.

"I also find that because this is a firearm and there were people close by, and I think we're all thankful that this tragedy wasn't compounded with the death of a nine-year-old girl. Like a seven-year-old girl maybe at the time.

"But that shooting under those circumstances did constitute an extreme indifference to the value of human life as is defined.

"And, so, based upon that, I find that beyond a reasonable doubt that [defendant] caused recklessly, with an extreme indifference to the value of human life, the death of [L], find him guilty of the lesser included offense of Manslaughter in the First Degree."

Defendant filed a motion to reconsider the verdict. He contended that if self-defense in using deadly force is not disproved by the state, and defendant committed his acts in a single incident, then the justified use of force carried over to the harm caused to L. Defendant reiterated this position at oral argument, contending that the court's ruling presupposed that defendant acted reasonably and recklessly at the same time. He also contended that the court could not reach the appropriate certainty of guilt given those conflicting findings.

The court declined reconsideration. Defendant was sentenced to 120 months in prison with three years of postprison supervision and he was ordered to pay $5,000 as restitution.

## II. ANALYSIS

### A. *Transferred Intent*

We begin by addressing defendant's first assignment of error, which contends that the trial court erred by denying defendant's motion to reconsider the verdict.[2] We also address defendant's second and third supplemental assignments of error, where defendant contends that the trial court erred by denying his motion for a judgment of acquittal on all of the charges of aggravated murder, and also erred by convicting him of first-degree manslaughter for the killing of L.

Defendant raises two arguments in support of these assignments. First, he argues that the doctrine of "transferred intent" should apply to the use of deadly force under ORS 161.219. Specifically, defendant asserts that his justification for shooting S transferred to his shooting of L because "[a]n innocent intent transfers exactly like a guilty one." In other words, defendant argues that because the trial court found that his use of deadly force against S was reasonable and justified under ORS 161.219, that intentional act "follow[ed] the bullet" and justified his killing of L. Thus, defendant contends that the trial court's legal finding that he acted recklessly toward one victim, L, was legally impermissible and therefore the court erred by not acquitting defendant. Second, defendant argues that the state failed to prove that L had not been engaged in the conduct described by ORS 161.219(1) to (3), and also failed to prove that defendant's belief that L was engaged in that conduct was unreasonable.

As a preliminary matter, a judgment of acquittal is appropriate if the evidence is insufficient to support a

---

[2] The state argues that the claim of error is not reviewable because the trial court did not actually deny the motion for reconsideration and no statute authorizes the filing of such a motion. We recognize that motions for reconsideration can create procedural problems and that their status is not entirely clear. *Kuang v. Kuang*, 336 Or App 168, 180, ___ P3d ___ (2024). Nevertheless, we reject the state's arguments about why the claim of error is not reviewable. The trial court effectively denied the motion and we conclude that we have authority to review the trial court's decision. Regarding preservation, under the unusual circumstances of this case, we conclude that the preservation requirement was excused. *State v. Keene*, 317 Or App 19, 23-24, 505 P3d 418 (2022).

verdict. *State v. Cunningham*, 320 Or 47, 61-62, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995); *State v. Newkirk*, 319 Or App 131, 133, 509 P3d 757, *rev den*, 370 Or 214 (2022). We review questions of the sufficiency of the evidence following a conviction by examining the evidence in the light most favorable to the state to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Palomo*, 256 Or App 498, 503, 301 P3d 439 (2013).

A person may lawfully use reasonable physical force, including deadly force, in self-defense. ORS 161.209.[3] The use of deadly force in self-defense is limited to certain situations outlined in ORS 161.219:

"Notwithstanding the provisions of ORS 161.209, a person is not justified in using deadly physical force upon another person unless the person reasonably believes that the other person is:

"(1) Committing or attempting to commit a felony involving the use or threatened imminent use of physical force against a person; or

"(2) Committing or attempting to commit a burglary in a dwelling; or

"(3) Using or about to use unlawful deadly physical force against a person."

Self-defense "does not negate the intent element of a crime; instead, it provides a legal justification for what would otherwise constitute a criminal act." *State v. Bracken*, 174 Or App 294, 301, 23 P3d 417, *rev den*, 333 Or 162 (2001). It is an intentional action, "different from an accident, which lacks assaultive intent." *State v. Boyce*, 120 Or App 299, 306, 852 P2d 276 (1993).

"[O]nce self-defense has been raised by a defendant, the state has the burden of disproving it beyond a reasonable doubt." *State v. Oliphant*, 347 Or 175, 190-91, 218 P3d 1281

---

[3] ORS 161.209 provides, in full:

"Except as provided in ORS 161.215 and 161.219, a person is justified in using physical force upon another person for self-defense or to defend a third person from what the person reasonably believes to be the use or imminent use of unlawful physical force, and the person may use a degree of force which the person reasonably believes to be necessary for the purpose."

(2009) (citing ORS 161.055). To determine whether the state has met that burden, a factfinder must weigh "(1) whether the defendant reasonably believed that the victim used or threatened to use unlawful physical force against the defendant; and (2) whether the defendant used a degree of force in self-defense that the defendant reasonably believed was necessary." *State v. Poitra*, 261 Or App 818, 820-21, 323 P3d 563 (2014).

"The legal standard for assessing the reasonableness of a person's belief about the need for force or the extent of force necessary turns on an objective evaluation of the circumstances in which physical force has been used or threatened, and not on the personal perceptions of the individual defendant." *State v. Strickland*, 303 Or App 240, 244, 463 P3d 537, *rev den*, 366 Or 827 (2020) (emphasis omitted). The question is therefore "how a reasonable person would have assessed the circumstances in which defendant found himself at the time * * *." *Id.*

Turning to the doctrine of transferred intent, in *State v. Wesley*, 254 Or App 697, 707, 295 P3d 1147, *rev den*, 354 Or 62 (2013), we held that that the common-law doctrine remained a part of the Oregon law of murder following the adoption of the new Criminal Code in 1971. Under that doctrine, "'if one shoots at A and misses him, but kills B, this is murder; because of the previous felonious intent, which the law transfers from one to the other.'" *Id.* at 703 (quoting William Blackstone, 4 *Commentaries on the Laws of England* 201 (1769)). In other words, "'the intention follows the bullet.'" *Id.* (quoting *Gladden v. State*, 273 Md 383, 397, 330 A2d 176 (1974)).

However, *Wesley*'s conclusion appears to be limited to circumstances where the doctrine of transferred intent is being applied to a person who has "kill[ed] someone in the course of attempting murder," and recognizes that the doctrine prevents that person from escaping liability for their criminal conduct merely because they did not intend to kill the particular victim. *Id.* at 708 (explaining that if we "conclude that killing someone in the course of attempting murder is not murder, but killing someone in the course of attempting or committing robbery or various other lesser

offenses *is* murder, that conclusion would run afoul of the Oregon Supreme Court's jurisprudence concerning Article I, section 16, of the Oregon Constitution, which requires that penalties be proportioned to the offense." (Emphasis in original.)). It is not clear that the doctrine would hold in the context of a person's use of deadly force under ORS 161.219. After all, it is the intent to commit a murder that is the foundation of the "transferred intent" doctrine for homicide that we described in *Wesley*, and a person need not intend to commit a murder in order to be justified in using deadly force under ORS 161.219.

Moreover, to be justified in using deadly force against another person, a person must reasonably believe that "the other person" is engaged in the conduct set out in ORS 161.219(1) to (3). Given the specific use of the term "other person," it is doubtful that the legislature would have intended that a person's reasonable belief that one person was engaged in the conduct described in ORS 161.219 would also justify the use of deadly force against a third person— not engaged in that conduct—who merely happened to be nearby. Put another way, although the intent to commit a murder might "follow the bullet" under the doctrine of transferred intent, the legislature in ORS 161.219 expressly conditioned a person's use of deadly force on their reasonable belief that a particular person—*i.e.*, the person killed— was engaged in the conduct described by ORS 161.219 (1) to (3).

In this case, defendant argues, as explained above, that the court's findings cannot be legally sufficient to support his conviction for manslaughter because once the trial court had found that he was reasonable in using deadly force against S, that justified, intentional act transferred from S to L. Defendant contends that it was not "legally permissible" for the trial court to find that defendant acted recklessly when he fired at L. Thus, defendant's argument ultimately turns on the premise that it is not his *intent* that transferred, but rather it is the *justification* for the crime that transferred. That argument, however, ignores the fact that justification for the use of deadly force under ORS 161.219 is

specific to the particular "other person" that is engaged in the conduct described by ORS 161.219(1) to (3).

Accordingly, because the legislature limited the scope of justification for using deadly force to force used against the "other person" who is reasonably believed to be committing a qualifying felony, burglary, or who is using or about to use unlawful deadly force, our review turns to whether the evidence in the record was legally sufficient to support the trial court's finding that defendant's shooting of L was not justified under ORS 161.219.

Here, we conclude that the trier of fact could reasonably conclude that defendant's use of force against S was justified, but nonetheless also conclude that defendant's use of force with respect to L was reckless and committed under circumstances manifesting extreme indifference to the value of human life. Specifically, the record included evidence that defendant's son, T, who was present at the apartment, told the investigating officers that he never saw L or S with a gun, and that defendant, "just shot [L] for no fucking reason, just because he was there with [S]." Brandi, defendant's wife, who also witnessed the killings, stated to investigating officers that defendant "fired three shots. He fired three shots, and [S] ran out the door. And then [L], he was calm. He was like, 'Man calm down[,]'" as the shooting was happening. According to Brandi, defendant "shot [L] for no reason. He wasn't doing anything." Further, according to multiple witnesses, when defendant shot L, L had his hands up, and was trying to get out of the apartment.

Considering all of the evidence in the light most favorable to the state, a reasonable trier of fact could conclude that defendant used a degree of force against L that was objectively unreasonable. And although defendant's contrary statements may have sufficed to permit a reasonable trier of fact to find that S had displayed a gun, and that L may have picked up that gun after defendant began shooting, the possibility of those contrary inferences is a quintessential question of fact for the factfinder. *See, e.g., State v. Hall*, 327 Or 568, 574, 966 P2d 208 (1998) (the defendant was not entitled to judgment of acquittal where factfinder "reasonably could infer" different things from the evidence

but, because "[a]ny of those inferences is reasonable * * * it was appropriate to allow the jury to decide the question"). Thus, because the trial court's finding that defendant recklessly caused the death of L is supported by evidence in the record, the trial court did not err by failing to acquit defendant of any offense arising out L's death.

B.   *Due Process: Notice of Lesser-Included Offense*

Defendant argues in his first supplemental assignment of error that the trial court violated defendant's due process rights by convicting him of first-degree manslaughter. Specifically, defendant argues that the trial court failed to provide him with notice that the court, sitting as the finder of fact, would be considering a lesser-included offense. Defendant further argues that he had no practical opportunity to raise his due process notice argument before the trial court, and, thus, preservation should be waived.[4]

In Oregon, it is well established that an indictment of one offense includes, by necessary implication, charges of lesser-included offenses. *State v. Gibbons*, 228 Or 238, 241-42, 364 P2d 611 (1961). Because a lesser-included offense is necessarily included within a greater charged offense, the state need not provide any specific notice beyond the indictment regarding a lesser-included offense. *State v. Washington*, 273 Or 829, 837, 543 P2d 1058 (1975) ("Since the defendant had notice as to all elements of lesser crimes necessarily included in the principal offense, no due process notice problems were involved in allowing a conviction on the lesser included offense.").

Against the above legal framework, the question for us is rather narrow; namely, whether the trial court had authority to consider defendant's guilt with respect to a lesser-included offense on its own accord without providing additional notice to the parties. Previously, we have found the answer to be yes, because the lesser-included offense is already before the court by virtue of the greater charged offense. *See State v. Cuffee*, 87 Or App 293, 296, 742 P2d 637 (1987) (affirming the proposition that the trial court had the

_____

    [4] As explained in footnote 2 above, we concluded that defendant was excused from preserving his argument given the unusual circumstances of the case.

authority to consider a lesser-included offense of a greater charged offense when it was sitting as the finder of fact for the lesser-included offense); *State v. Mink*, 30 Or App 339, 344, 567 P2d 1033, *rev den*, 280 Or 397 (1977) (concluding that an infraction DUII was a lesser-included offense of the misdemeanor DUII and, as a result, the trial court properly convicted the defendant of the infraction). However, we articulated a narrow exception to that general principle in *State v. Barrie*, 227 Or App 378, 206 P3d 256 (2009) and *State v. Keene*, 317 Or App 19, 505 P3d 418 (2022).

In *Barrie*, we noted the general rule under ORS 136.465[5] that "an indictment for a greater offense necessarily places a defendant on notice of the possibility of his being convicted of a lesser-included offense." 227 Or App at 382-83. However, we also acknowledged that the general rule "is subject to the overarching due process concern *** that a defendant must have notice and an opportunity to prepare a defense." *Id.* at 383. We concluded that the defendant in *Barrie*, notwithstanding the general rule, "had every reason to believe that" the trial court would not "enter a conviction for criminally negligent homicide," a lesser-included offense of the charged offense, second-degree manslaughter. *Id.* That was because the state had informed the defendant, prior to trial, that "we are not going to let you have a jury trial on [criminally negligent homicide]." *Id.* at 384 (brackets in original). Moreover, the defendant had relied on that pretrial representation in preparing his defense. *Id.* at 383 (noting that the defendant's "opening statement and closing argument centered on the recklessness element of manslaughter"). Thus, *Barrie* articulated an exception, reflected in ORS 136.465 and ORS 136.460(1), that applies when a defendant has been affirmatively informed prior to trial that the state will not seek a conviction on a lesser-included offense, and the defendant relies on that representation in preparing their defense.

---

[5] ORS 136.465 provides:

"In all cases, the defendant may be found guilty of any crime the commission of which is necessarily included in that with which the defendant is charged in the accusatory instrument or of an attempt to commit such crime."

We applied that exception when we decided *Keene*. Similar to *Barrie*, the defendant in *Keene* had been told, prior to trial, that the state "was not interested in offering a plea deal," and the state had, in effect, informed the defendant that the state would not be seeking a conviction on a lesser-included offense. 317 Or App at 26. Accordingly, the defendant had tried her case as an "all-or nothing proposition." *Id.* Under those circumstances, the defendant "lacked actual notice that the lesser-included offense was under consideration, making her conviction the product of a due process violation." *Id.*

In this case, defendant—unlike the defendants in *Barrie* and *Keene*—had both the general notice under ORS 136.460(1) that he could be convicted of a lesser degree of criminal homicide, and actual notice that he could be convicted of those lesser offenses. Defendant had actual notice that he could be convicted of a lesser degree of criminal homicide, specifically manslaughter, because prior to trial, defendant raised the defense of self-defense under ORS 161.219. By doing so, defendant represented that he believed the facts would show that he had intentionally or knowingly killed both victims, and that his conduct had been justified. *See State v. Boyce*, 120 Or App 299, 306, 852 P2d 276 (1993) ("To act in self-defense, a person must intentionally or at least knowingly engage in an act to prevent another from imminent use of physical force."). Thus, defendant would have been on notice that he also was effectively conceding that he had acted recklessly.[6] *See* ORS 161.115(3) ("When recklessness suffices to establish a culpable mental state, it is also established if a person acts intentionally or knowingly."). Accordingly, defendant is incorrect to suggest that the trial court's consideration of the lesser-included offense of manslaughter was a surprise that defendant had no reason to anticipate.

Further, unlike the defendants in *Barrie* and *Keene*, defendant cannot show that he relied on any pretrial

---

[6] As we explained in *State v. Teitsworth*, 257 Or App 309, 317 n 5, 304 P3d 793, *rev den*, 354 Or 342 (2013), where a defendant asserts that "he acted in self-defense, [the] defendant concede[s] that he acted knowingly or intentionally." And "[b]ecause evidence that a defendant acted knowingly or intentionally is sufficient to establish that the defendant acted recklessly," the defendant in *Teitsworth* had "effectively conceded the culpable mental state [recklessness] for the charged assault" by raising the defense of self-defense.

representation by the state that it would not seek convictions on lesser-included offenses. Defendant points to nothing in the record reflecting that he had been told, prior to trial, that the state would not seek a conviction on a lesser-included offense. And defendant points to nothing in the record indicating that he based his defense of self-defense on a representation by the state that it would not seek a conviction on a lesser-included offense. For those reasons, *Barrie* and *Keene* are distinguishable and do not control the outcome of this case. Defendant was charged with aggravated murder and had notice that he could be found guilty of any lesser degree of criminal homicide. ORS 136.460(1). The trial court had authority to convict defendant of the lesser-included offense of manslaughter and the trial court did not violate defendant's rights to due process.

C. *Child's Therapy Records*

Finally, we address defendant's remaining assignments of error. In 2020, G, S's daughter who witnessed the incident, was interviewed by a forensic interviewer at a Children's Advocacy Center (CAC) in Missouri. In a videotaped interview, she told an advocate that S and L were trying to leave when defendant came out with a gun and "made sure that they *** got shot." She also said that L had his hands up when defendant shot him. The state sought to introduce the interview as hearsay statements concerning abuse. Defendant filed a motion to compel the state to provide additional information about the interview, including records of G's therapy prior to the interview, or alternatively to limit the use of the interview. The court denied the motion and admitted the interview.

On appeal, defendant argues that the trial court erred when it denied his motion for additional discovery or to limit the use of the interview. Defendant argues that because G had been subject to that interview, "[t]here was likely to be substantial impeachment evidence surrounding what prompted the interview and in counseling records if those were also done at the state's behest." Because of this interview, defendant argues that the prosecutor was obliged by ORS 135.815 and *Brady v. Maryland*, 373 US 83, 87, 83 S Ct 1194, 10 L Ed 215 (1963) to provide records of G's

counseling, therapy, and CAC interview beyond what the state had already disclosed to defendant.

"Whether [a] defendant was entitled to discovery is a question of law, which we review for legal error." *State v. Wixom*, 275 Or App 824, 828, 366 P3d 353 (2015), *rev den*, 359 Or 166 (2016).

ORS 135.815 requires a prosecutor to disclose exculpatory or impeachment evidence that is within the prosecutor's "possession" or "control."[7] In this case, there is no evidence in the record—and defendant has not suggested otherwise—that the prosecutor possessed G's therapy or counseling records, or possessed any records related to the forensic interview beyond what it had already provided to defendant. Thus, the dispositive issue turns on whether the prosecutor had control of the additional records that defendant sought.

As we explained in *Wixom*, the legal standard for prosecutorial control of records can be established in two ways. 275 Or App at 831-32. First, "if an entity is *required* to disclose records to the district attorney or to police, the prosecution has control over the records and, accordingly, must disclose to a defendant any of those records that fall within ORS 135.815." *State v. Daniels*, 261 Or App 519, 528, 323 P3d 491, *rev den*, 355 Or 668 (2014) (emphasis in original). Second, "information that the prosecutor may obtain directly is within the prosecutor's 'control' * * * even if it was

---

[7] ORS 135.815 provides, in pertinent part, that:

"(1) Except as otherwise provided in ORS 135.855 and 135.873, the district attorney shall disclose to a represented defendant the following material and information within the *possession or control* of the district attorney:

"(a) The names, addresses and telephone numbers of persons whom the district attorney intends to call as witnesses at any stage of the trial, together with their relevant written or recorded statements or memoranda of any oral statements of such persons.

"* * * * *

"(g) Any material or information that tends to:

"(A) Exculpate the defendant;

"(B) Negate or mitigate the defendant's guilt or punishment; or

"(C) Impeach a person the district attorney intends to call as a witness at the trial."

(Emphasis added.)

not in the prosecutor's physical possession." *State v. Warren*, 304 Or 428, 433, 746 P2d 711 (1987).

Applying those legal principles here, we conclude that the trial court did not err in denying defendant's motion to compel, because the records were not "within the possession or control of the district attorney." ORS 135.815(1). First, there is no evidence that the Missouri CAC center, G's therapist, or G's counselor were "required" to disclose to the state the records defendant sought. *Cf. State v. Bray*, 281 Or App 584, 597, 383 P3d 883 (2016), *aff'd*, 363 Or 226, 422 P3d 250 (2018) (Google was not "required" to disclose information to the prosecutor because the pertinent federal statute was phrased permissively).

Second, there is no evidence that the prosecutor could have "obtained directly" the records from the CAC center, G's therapist, or G's counselor. In *Bray*, we concluded that because the information the defendant sought was not "obtainable by [the prosecution] without the cooperation of an intermediate entity, [the] defendant [was] not entitled to it under discovery statutes." *Id.* at 598. Similarly, here, defendant has not shown that the prosecutor could have obtained directly—that is, without the cooperation of an intermediate entity—G's therapy records, counseling records, or the records of the forensic center in Missouri where G was interviewed. There is no indication that the forensic center would have provided those additional records to the prosecutor "on request" and it is likely that the prosecutor would have had to issue process to do so. *See State v. Bray*, 363 Or 226, 236, 422 P3d 250 (2018) (explaining that "when the state cannot obtain documents without judicial assistance, it cannot be said to have power over them"). As such, it cannot be said that the prosecutor had "control" over the records defendant sought. *Id.*

Defendant also argues that he had a due process right to compel the prosecutor to provide him with "any record" of the forensic interview and G's therapy records because those records would be material and exculpatory. *See Brady*, 373 US at 87 (holding that the prosecution's failure to disclose "evidence favorable to an accused *** violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"); *Bray*,

281 Or App at 599 (evidence is favorable if it is "directly excul-patory or could be used to impeach a government witness").

However, defendant has not shown that the records he sought were in the prosecutor's actual or constructive pos-session. *See Bray*, 281 Or App at 601 (explaining that "actual possession refers to material in possession of the prosecu-tion itself, while constructive possession extends to material that is in the possession of others acting on the government's behalf, *** including the police"). As noted above, defendant does not contend that the records were in the prosecution's actual possession, and defendant has not shown that G's ther-apist, her counselor, or the Missouri CAC center were part of the Josephine County prosecutorial "team" for constructive possession. Defendant never made a showing that G's coun-selor or therapist were acting on the prosecutor's behalf, or under the prosecutor's direction, in providing services to G—and defendant's speculation that there was a "likelihood" that the Missouri forensic center was working at the state's behest is insufficient. *Bray*, 281 Or App at 603 ("We have found no authority for the proposition that *Brady* requires the prosecution to seek out or disclose evidence in the pos-session of private persons or institutions, *** that cannot be considered part of the prosecutorial 'team'."). Accordingly, because the information defendant sought was neither in the actual nor constructive possession of the prosecution, the trial court did not violate defendant's due process rights by declining to order the prosecutor to obtain and disclose those records to defendant.[8]

Affirmed.

---

[8] In the alternative, defendant also argues that the trial court was obliged to conduct an *in camera* review of the forensic "records concerning G" to review for exculpatory evidence and that the trial court should have excluded G's inter-view from evidence. However, even if the trial court erred by declining to exclude G's recorded statement or review for additional exculpatory evidence contrary to G's statements, any error was harmless because defendant (1) failed to iden-tify any actual prejudice arising from the state's purported discovery violation, (2) the trial court's oral findings reflect that the trial court discounted G's version of events in her recorded statement, and (3) G's recorded statement was merely cumulative of other evidence. Thus, there is little likelihood that the admission of that statement affected the verdict. *See State v. Davis*, 336 Or 19, 32-35, 77 P3d 1111 (2003) (explaining harmless error analysis); *see also, e.g.*, *State v. Dupree*, 164 Or App 413, 417-18, 992 P2d 472 (1999), *rev den*, 330 Or 361 (2000) (describing harmless error inquiry for alleged discovery violation).